## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| T.G. PLASTICS TRADING CO. INC., d/b/a NATIONAL PLASTICS TRADING CO. ) ) ) ) V. ) ) TORAY PLASTICS (AMERICA), INC. ) ) | C.A. No. 09-336/M |

### MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Judge

Plaintiff T.G. Plastics Trading Co. Inc., d/b/a National Plastics Trading Co. ("National Plastics") sued Defendant Toray Plastics (America), Inc. ("Toray") for allegedly breaching the settlement agreement that arose from prior litigation. Toray countersued, also alleging a contract breach.

Although there are fourteen claims between the parties, in essence this is a claim by each party for allegedly breaching a contract. Both parties have moved for summary judgment seeking to dismiss all of the claims against them, respectively. (ECF Nos. 174 & 178.)

This Court GRANTS IN PART Toray's Motion for Summary Judgment (ECF No. 174) and dismisses Counts II, III, IV, and VII, and DENIES summary judgment for all other counts. This Court GRANTS IN PART National Plastics' Motion for Summary Judgment (ECF No. 178), and dismisses Counterclaims IV, V and VII, and DENIES summary judgment for all other counterclaims.

## I.    FACTS

Toray, a Rhode Island corporation, manufactures plastic film products. (ECF No. 175 at ¶ 1.) National Plastics, a Colorado corporation, purchases plastic film products and resells them to other companies for a profit. *Id.* at ¶ 2. These companies had a previous long-term business relationship; Toray would sell some of its second grade quality materials to National Plastics, which in turn resold them. (ECF No. 198 at ¶ 1.) At the heart of this dispute is the settlement agreement ("Agreement") that ended earlier litigation between the two companies in 2007. (ECF No. 175 at ¶ 13.)

The Agreement established the business relationship's terms proceeding from 2007 through 2024. (ECF No. 1, Exhibit A.) The Agreement requires Toray to sell certain materials ("agreed materials") exclusively to National Plastics. *Id.* The Agreement defines agreed materials as "scrap plastic, other scrap, second quality materials, downgraded materials, recyclable materials not reused internally and aged film." *Id.* at 3. None of the terms within this definition are further defined.

At National Plastics' request during the negotiations process, Toray sent National Plastics a list of materials that Toray sold. (ECF No. 175 at ¶¶ 30 & 31.) Toray made no representations about how it defined the materials on this list, but National Plastics asserts they believed that these materials would be included as the "agreed materials" under the Agreement. *Id.*

In exchange for Toray exclusively selling all of the agreed materials to National Plastics, National Plastics receives a "straight twelve percent (12%) of all sales generated by National Plastics." (ECF No. 1, Exhibit A at 4.) In addition, the Agreement requires National Plastics to use its best efforts to maximize pricing, tie the price to market conditions, and share its pricing method with Toray. *Id.* The Agreement gives each party the right to audit the other party on an

annual basis, but does not define the audit's scope. *Id.* at 5. The Agreement also includes a disclaimer and an integration clause. *Id.*

Almost immediately, disputes arose over the proper pricing of the agreed materials and the definition of the agreed materials. As to the proper pricing, National Plastics' practice was to request pricing from its customers, communicate the pricing back to Toray, and ultimately charge its customers the price Toray invoiced for the agreed materials. (ECF No. 179 at 2-3.) National Plastics then retained twelve percent of Toray's invoice price for the agreed materials and remitted the remaining eighty-eight percent to Toray. *Id.* at 3. National Plastics charged its customers separately for transportation costs, and did not remit any payment to Toray based on payments received for transportation costs. *Id.* These transportation costs amounted to $499,518.40 in total. (ECF No. 194 at ¶¶ 13-20.)

In 2008, David Jose, Toray's Chief Financial Officer, sent a number of emails to Torge Goderstad, National Plastics' President, requesting that National Plastics increase the price it charged customers and stop charging customers separately for transportation costs. (ECF No. 194, Exhibits B-E.) Mr. Goderstad affirmed his desire to increase the agreed materials' price but never conceded that National Plastics had charged its customers any differently than the Agreement required. *Id.*

Since the parties entered into the Agreement, Toray has substantially increased its capacity to recycle its own plastic films. (ECF No. 175 at 8). Consequently, the volume of agreed materials that National Plastics received from Toray decreased. *Id.* The Agreement specifically envisions Toray's increased recycling and calls for Toray and National Plastics to adapt to these changes. (ECF No. 1, Exhibit A at 4.)

For accounting purposes, Toray defines film older than 13 months as aged film. *Id.* at 5. Though it charges the same price for aged film as it charges for newer film, Toray places a valuation reserve[1] on the aged film when it reaches 13 months, and another valuation reserve when it reaches 19 months. *Id.*

In 2008, National Plastics became concerned Toray was not exclusively selling a hundred percent of the agreed materials to National Plastics. (ECF No. 188, Exhibit 15.) In early 2009, National Plastics exercised its right under the Agreement to audit Toray. (ECF No. 1, Exhibits D-L.) While Toray partially complied with National Plastics' requests for documents, Toray refused to release many of the documents that National Plastics deemed necessary for an audit. (ECF No. 1, Exhibit H.) Toray refused to release the requested documents on the grounds that National Plastics' audit exceeded the scope envisioned by the Agreement. *Id.* This dispute led National Plastics to initiate this lawsuit. National Plastics has since tried to obtain these documents through discovery, however, Magistrate Judge Lincoln D. Almond denied National Plastics' request for these documents. (ECF No. 18.)

In 2011, National Plastics did not remove all the agreed materials at Toray's facilities that were ready for delivery. (ECF No. 122.) Toray then spent $5,406.50 to transport and store these materials in an off-site warehouse. *Id.*

This litigation began in 2009 when National Plastics sued Toray for breach of contract. (ECF No. 1.) In 2011, Toray filed counterclaims. (ECF No. 65-1.) National Plastics alleges seven counts in its Complaint:

---

[1] When a company puts a valuation reserve on their assets, they are pulling these assets off the market and holding on to them as backup in case of unexpected debt. *Investopedia – Asset Valuation Reserve*, http://www.investopedia.com/terms/a/asset-valuation-reserve-avr.asp (last visited August 2, 2013).

1. Breach of contract with respect to definition of the agreed materials and scope of the audit,

2. Breach of duty to a partner or fiduciary,

3. Tortious interference with a third party contract,

4. Tortious interference with prospective business advantage,

5. Breach of the duty of good faith and fair dealing,

6. Negligent misrepresentation, and

7. Request for award of attorneys' fees.

Toray countersued alleging seven of its own counts:

1. Breach of contract for not charging the proper price of the agreed materials,

2. Breach of contract for not using best efforts to maximize the price of the agreed materials,

3. Breach of contract for not tying pricing to market conditions,

4. Breach of contract for not sharing market pricing with Toray,

5. Breach of contract for not removing agreed materials in a timely manner,

6. Breach of the duty of good faith and fair dealing, and

7. Request for specific performance of the Agreement.

Both parties have engaged in substantial discovery since litigation began. In May 2013, both parties moved for summary judgment seeking to dismiss all claims against them. (ECF Nos. 174 & 178.)

## II.   STANDARD OF REVIEW

Under Rule 56(c), a party is entitled to summary judgment as a matter of law only if there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c)(2). "An issue is genuine if 'the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 43 (1st Cir. 2009)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is one affecting the outcome of the case. *See Martinez-Rodriguez v. Guevara*, 597 F.3d 414, 419 (1st Cir. 2010). When ruling on motions for summary judgment, the court looks to the facts in the light most favorable to the nonmoving party. *Cont'l Cas. Co. v. Canadian Univ. Ins. Co.*, 924 F.2d 370, 373 (1st Cir. 1991). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [this Court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001). Although both parties dispute many of the facts in this case, most of the disputed facts are not material. Thus, where the moving party has successfully shown that no genuine issue exists as to any material facts, this Court will resolve the issue as a matter of law.

## III. ANALYSIS

"Settlement agreements are treated as contracts and enforced under the rules governing contracts generally." *United States v. Fairway Capital Corp.*, 453 F. Supp. 2d 226, 244 (D.R.I. 2006)(citing *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d. 481, 484 (2d Cir. 1999)). The question of whether a contract is ambiguous is a question of law, and this Court may consider all evidence before it when deciding this question. *See Rotelli v. Catanzaro*, 686 A.2d 91, 94 (R.I. 1996). "In determining whether or not a particular contract is ambiguous, the court should read the contract 'in its entirety, giving words their plain, ordinary, and usual meaning.'" *Haviland v. Simmons*, 45 A.3d 1246, 1258 (R.I. 2012) (quoting *Young v. Warwick Rollermagic Skating Center, Inc.*, 973 A.2d 553, 558 (R.I. 2009)). "[A] contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation." *Rotelli*, 686

6

A.2d at 94. If this Court determines that an ambiguity exists within the contract, then summary judgment is inappropriate and the proper construction of the contract is a question of fact for the fact-finder. *See Haviland*, 45 A.3d at 1258-59.

### A.   Breach of Contract Claims

#### 1.   National Plastics' breach of contract claims ("agreed materials" and audit - Count I) and Toray's breach of contract counterclaim (proper pricing - Counterclaim I)

At the heart of this litigation is a dispute over some of the Agreement's terms. National Plastics contends Toray violated the Agreement by not selling National Plastics certain agreed materials and by not submitting to a full audit. Conversely, Toray alleges that National Plastics violated the Agreement by not paying Toray as required by the Agreement, not using its best efforts to maximize pricing, not tying its pricing to market conditions, not sharing pricing information with Toray, and not removing the agreed materials in a timely manner. National Plastics responds that Toray has not sufficiently alleged damages for the failure to use best efforts, tie pricing to market conditions, and share pricing information with Toray.

*Agreed Materials.* The Agreement specifies: "Toray will exclusively sell to National Plastics one hundred percent (100%) of all scrap plastics, other scrap, second quality materials, downgraded materials, recyclable materials not reused internally and aged film." (ECF No. 1, Exhibit A at 3.) The Agreement contains no further description of the type of materials that Toray must sell to National Plastics. Both parties dispute the meanings of these terms. For example, National Plastics contends that the Agreement requires Toray to sell all materials that the agreed materials definition could plausibly describe. Toray asserts this clause only requires Toray to sell National Plastics materials Toray cannot sell directly to its own customers and

cannot recycle itself.  According to Toray, this interpretation of the agreed materials clause reflects the business relationship between the parties prior to the Agreement.

These differing interpretations led specifically to a dispute over the definition of "aged film" and whether Toray breached its obligations by not selling its aged film to National Plastics. National Plastics brought this complaint because Toray had not sold all of its aged film to National Plastics.  Toray insists the Agreement does not cover its aged film; it is only "aged" film because of Toray's internal accounting definitions.  Toray sells its aged film at the same price as its newer film, though it does place a general reserve on the film after it has reached 13 months and another reserve after it has reached 19 months of age.

The Agreement in plain language lists aged film as an agreed material that Toray must sell to National Plastics.  However, the nature of the industry implies the parties used the term "aged film" as an industry-specific term of art.[2]  Further, the other products listed as agreed materials imply lower quality or less salability.  Looking only within the four corners of the Agreement, the definition of aged film is ambiguous and susceptible to more than one interpretation.  This Court may then look at all evidence before it, including parol evidence, to clarify the meaning of the Agreement's terms.  *See Rotelli*, 686 A.2d at 95.

Toray bases its interpretation on the previous business relationship between the parties and argues that the Agreement only memorializes the companies' past business practices. Therefore, the agreed materials refer to "all products and materials that Toray could not sell to its customers and could not recycle internally."  (ECF No. 174 at 9.)  Toray concedes the

---

[2] Toray's film products technically begin aging right after Toray produces them and continue to age every day thereafter.  Clearly, both parties meant for aged film to refer to some specific subset of all film products.

Agreement ambiguously defines aged film, yet argues there is no genuine issue of material fact because Toray has acted consistently with the companies' historic business relationship.

National Plastics responds by submitting language from prior drafts of the Agreement. (ECF Nos. 188-8 and 188-9.) The earlier drafts do not include aged film in the description of materials that Toray will sell to National Plastics. *Id.* Aged film does not appear in the description of agreed materials until the final draft. (ECF No. 1, Exhibit A.) National Plastics argues this final draft represents a new arrangement different from the historic business relationship because the addition of aged film to the agreed materials' definition implies that the parties intentionally changed the previous drafts' definition of agreed materials.

This Court must determine whether the Agreement is reasonably and clearly susceptible to more than one interpretation. Given the lack of clarity within the four corners of the contract and based on the opposing extrinsic evidence before this Court, the definition of "agreed materials" is certainly ambiguous and raises material issues of fact. It is not susceptible to summary disposition.

***The Audit.*** The Agreement states "[t]he parties shall have the right to audit the other party on an annual basis at the expense of the party requesting the audit." (ECF No. 1, Exhibit A at 5.) National Plastics argues that the absence of any limiting language means the language clearly and unambiguously allows a full audit of the other party. Toray responds that the scope of the Agreement limits the scope of the audit. It asserts the Agreement primarily covers the sale of agreed materials and does not control other aspects of Toray or National Plastics' business. Given the past relationship between the two parties, Toray fears the parties could use a full audit punitively against each other in ways that a more limited audit could not.

National Plastics tried to obtain documents it alleged it needed for a full audit through discovery and brought a motion to compel Toray to release these documents. Judge Almond held that the "purpose of the audit is to determine if Defendant is selling materials to others that it promised to sell to Plaintiff." (ECF No. 18 at 2.) The Court then denied National Plastics' motion, finding that "many of the requests on their face [are] overly broad and not narrowly tailored to the disputes at hand in this case." *Id.* at 5.

This Court agrees with Judge Almond that it is clear from the Agreement the audit's purpose was to determine whether Toray was exclusively selling the agreed materials to National Plastics. However, in moving for summary judgment on National Plastics' claim concerning the audit, Toray singularly asserts, "this Court has already held that many of the documents requested by National Plastics were totally inappropriate." (ECF No. 174 at 9.) Nevertheless, Judge Almond's order denying National Plastics' motion to compel is not definitive in determining National Plastics' claims concerning the audit envisioned by the Agreement. His order merely resolved the scope of a discovery issue that was before him.

This Court finds that Toray has not met its burden to prove that it did not breach the Agreement. Genuine issues of material fact exist with respect to the scope of the Agreement's audit. Therefore, the Agreement requires extrinsic evidence for interpretation, which raises material issues of fact to be decided by the fact finder.

***Proper Pricing – Transportation Costs***. The Agreement states "[i]n order to insure that Toray is receiving competitive market pricing, National Plastics will work on a straight twelve percent (12%) of all sales generated by National Plastics." (ECF No. 1, Exhibit A at 4.) Neither party disputes National Plastics retained twelve percent specifically of the price it charged customers for the agreed materials and remitted the remaining eighty-eight percent to Toray.

10

The dispute arises on whether National Plastics violated the Agreement by charging customers separately for transportation costs instead of reflecting those costs in the price of the agreed materials.[3]

Toray alleges that by charging customers separately for transportation, National Plastics is charging substantially less than the Agreement requires and thus breaching the contract by lowering the total price to which Toray is entitled to 88%. To support this position, Toray cites to email exchanges between National Plastics' President, Torge Goderstad, and Toray's Chief Financial Officer, David Jose, during the time the parties were drafting the Agreement. (ECF No. 194, Exhibits A.) In these emails, Mr. Goderstad and Mr. Jose discuss increasing the commission percentage that National Plastics would receive if National Plastics were to include costs in the price of the materials. While Mr. Jose did send an email to Mr. Goderstad making this suggestion, Toray has not provided any evidence that Mr. Goderstad, or anyone else from National Plastics, agreed to such a plan. *Id.* Furthermore, the Agreement itself does not describe how National Plastics would handle transportation and other logistics costs.

Toray next points to emails exchanged after National Plastics sold the first batch of agreed materials under the Agreement and remitted payment back to Toray. Internal emails sent between Mr. Jose and other Toray employees show frustration over the price National Plastics charged its customers because it was much lower than Toray expected. Mr. Jose conveyed this frustration to Mr. Goderstad of National Plastics, who agreed that he needed to increase pricing. Mr. Goderstad, however, never acknowledged that transportations costs should be included in

---

[3] Though unclear from its complaint, Toray implies in its memoranda that National Plastics incorrectly deducted a twelve percent commission from Toray's invoices instead of marking up the price National Plastics charged customers by twelve percent. Nevertheless, Toray did not allege this "breach" with the same clarity as that of the "transportation costs" issue and this Court will not otherwise address how and when the twelve percent commission should have factored into the price.

the agreed materials price. These emails only show National Plastics' commitment to increasing the agreed materials' price.[4] Although Mr. Jose explains that he wants higher prices because he alleges that National Plastics wrongly charged customers separately for the transportation costs, Mr. Goderstad never acknowledges, let alone agrees to this. There are genuine issues of material fact as to whether the Agreement requires inclusion of transportation costs in its pricing scheme, and therefore National Plastics' Motion for Summary Judgment on this issue is denied.

> **2.** **Toray's breach of contract counterclaims (best effort to maximize pricing, tying price to market conditions, and sharing pricing information - Counterclaims II, III, and IV)**

*Best Effort and Market Conditions.* Toray alleges in its counterclaim that National Plastics breached the Agreement by not making best effort to maximize pricing (Counterclaim II), not tying prices to market conditions (Counterclaim III), and not sharing pricing information with Toray (Counterclaim IV). National Plastics asserts that Toray failed to prove damages and therefore this Court must dismiss these claims.

To make out a viable claim for breach of contract, the party alleging the breach must prove the amount of damages it has suffered with a reasonable degree of certainty. *See Nat'l Chain Co. v. Campbell*, 487 A.2d 132, 134-35 (R.I. 1985). Toray bears the burden of proof in showing, "by competent evidence, the amount of damages that it suffered because of [National Plastic's] failure to perform." *See id.* Nevertheless, this Court should not deny recovery because damages are difficult to ascertain, as long as Toray can prove damage with reasonable certainty. *See id.*

---

[4] In fact, these emails seem to undercut Toray's argument that National Plastics did not use best efforts to maximize pricing as many emails reflect National Plastics successfully increasing the price that customers are willing to pay for the agreed materials.

Toray seeks damages in the amount of the transportation costs National Plastics charged its customers because these costs had the effect of lowering the price that customers would pay for the agreed materials. These costs amount to $499,518.40 in total. If National Plastics had not charged these costs separately, then National Plastics could have plausibly charged its customers $499,518.40 more during the period in question. Subsequently, Toray would have been entitled to 88% of these additional charges. On the issue of whether Toray has shown damages to support these three counterclaims, National Plastics has not established that there is no genuine issue of material fact.

What the Agreement specifically requires to satisfy the "best efforts" and "tied pricing" clauses is unclear from the Agreement itself. Toray has submitted as evidence "form emails" that National Plastics sent to potential customers to obtain pricing for the agreed materials. Whether these emails and the pricing that National Plastics did obtain satisfy the Agreement's "best efforts" and "tied pricing" clauses is unclear based on the plain language of the Agreement.

Thus, in viewing all the facts in the light most favorable to the non-moving party, Toray has alleged the amount of damages it has suffered with reasonable certainty, and there exists a genuine issue of material fact so that summary judgment is inappropriate. Therefore, National Plastics' Motion for Summary Judgment as to Counterclaims II and III must be denied.

*Sharing Pricing Information.* Toray claims that National Plastics violated the Agreement by not sharing pricing information. The Agreement requires National Plastics to "share with Toray market conditions and competitive bidding." However, much of the evidence both parties cite suggests that Toray and National Plastics actively communicated about market conditions for the price of the agreed materials. For example, to support its proper pricing claim (Counterclaim I), Toray cites emails from Mr. Goderstad sharing the price upon which customers

have agreed.   While Toray disagrees that the price National Plastics received was appropriate, the exchange nevertheless demonstrates the parties sharing information about pricing and competitive bidding.

This Court grants National Plastics' Motion for Summary Judgment with respect to Counterclaims IV because no genuine issues of material fact exist as to whether National Plastics complied with its obligation under the Agreement to share pricing information.

### 3.   Toray's breach of contract claim (not removing agreed materials in a timely manner - Counterclaim V)

Toray claims National Plastics did not remove agreed materials from Toray's facility in a timely manner, which cost Toray $5,406.50. The Agreement contains no language specifying a schedule for the removal of agreed materials or establishing a timeliness requirement. In section F, the Agreement envisions where and how National Plastics must receive Toray's materials but not when: ". . . handling of all materials shall take place at Toray.  Trailers shall be direct loaded at Toray for outbound shipment." (ECF No. 1, Exhibit A.)  Toray argues that this Court should read an implied requirement of timeliness into the Agreement. This Court declines to do so. The parties may have decided on not including a timeliness requirement for numerous reasons.  For example, National Plastics ships products directly from Toray to third party purchasers.   A timeliness requirement may not make sense if National Plastics did not have a customer for the products at the time. Furthermore, the amount of specificity in how the parties manage outbound shipping implies they contemplated the timing issue and nevertheless decided to leave out a timeliness requirement.

Therefore, National Plastics has shown there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on Toray's Counterclaim (V) asserting breach of an

implied timeliness condition. Because this Court finds as a matter of law no such condition exists, summary judgment is appropriate.

**B.    Breach of the covenant of good faith and fair dealing - Count V & Counterclaim VI**

This Court denies both National Plastics' and Toray's Motions for Summary Judgment for counts alleging breach of the duty of good faith and fair dealing. "Under Rhode Island law, 'it is well settled that there is an 'implied covenant of good faith and fair dealing between parties ... so that the contractual objectives may be achieved.'" *Saccucci Auto Group, Inc. v. Am. Honda Motor Co., Inc*, 617 F.3d 14, 26-27 (1st Cir. 2010)(citing *Now Courier, LLC v. Better Carrier Corp.*, 965 A.2d 429, 435 (R.I. 2009)). Rhode Island law does not recognize an independent tort action based on breach of the implied duty of good faith; nevertheless, on a theory of contract law, a plaintiff is entitled to expectation damages "against a party who failed to use best efforts to fulfill a promise." *See Russell v. Salve Regina Coll.*, 649 F. Supp. 391, 399 (D.R.I. 1986); *A. A. A. Pool Serv. & Supply, Inc. v. Aetna Cas. & Sur. Co.*, 395 A.2d 724, 725 (R.I. 1978).

The core question is whether a party's conduct is free from unreasonable or arbitrary conduct in determining if that party breached the covenant of good faith and fair dealing. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.* 66 F. Supp. 2d 317, 329 (D.R.I. 1999). "[A] party's actions must be viewed against the backdrop of contractual objectives in order to determine whether those actions were done in good faith." *Hord Corp. v. Polymer Research Corp. of Am.*, 275 F. Supp. 2d 229, 238 (D.R.I. 2003). When the contractual objectives are at the center of the dispute, then there is a genuine issue of material fact and summary judgment is inappropriate. *See Lifespan/Physicians Prof'l Servs. Org., Inc. v. Combined Ins. Co. of Am.*, 345 F. Supp. 2d 214, 225 (D.R.I. 2004).

In addition, the party alleging the breach cannot use the implied duty of good faith to rewrite the contract; the duty of good faith merely requires parties to perform the obligations actually expressed in the contract. *See AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001).

Both parties allege that the other has breached the covenant of good faith and fair dealing. However, both parties base their claims on opposing interpretations of what is at times an ambiguous contract. This Court therefore cannot at this time determine that no genuine issues of material fact exist that would allow summary judgment to enter for either party on the claims made against them. Therefore the parties' motions for summary judgment are denied on their claims of breach of duty of good faith and fair dealings.

### C. National Plastics' claim of breach of duty to a partner or fiduciary - Count II

Under Rhode Island law, a partnership is an "association of two or more persons to carry on as co-owners a business for profit." R.I. Gen. Laws § 7-12-17 (2012). Despite the admission that a "[p]artnership is a notoriously imprecise term," a number of factors can show the existence of a partnership. *See Southex Exhibitions, Inc. v. R.I. Builders Ass'n., Inc.*, 279 F.3d 94, 100 (1st Cir. 2002)(holding that a partnership did not exist because the parties did not share profits and losses, file partnership tax returns, own property jointly, or operate under a shared name). Use of the word "partner" in the colloquial sense does not establish a legal partnership. *See id.* at 101-02.

The existence of a partnership is a question of law. *See Filippi v. Filippi*, 818 A.2d 608, 618 (R.I. 2003)(citing *Boston & Colorado Smelting Co. v. Smith*, 13 R.I. 27, 34 (1880)). Nevertheless, when a party has extrinsic evidence supporting the existence of a partnership, a fact-finder must determine whether the partnership actually exists. *See Boston*, 13 R.I. at 34. The existence of a partnership must be determined based on the totality of the circumstances.

*See Southex*, 279 F.3d at 100.  Because National Plastics asserts that a partnership exists, it bears the burden of persuasion. *See id.* at 99.

Independent of a legal partnership, a fiduciary relationship arises when one party "rightfully reposes trust and confidence" in another. *A. Teixeira & Co., Inc. v. Teixeira*, 699 A.2d 1383, 1387 (R.I. 1997)(quoting Francis X. Conway, *The New York Fiduciary Concept in Incorporated Partnerships and Joint Ventures*, 30 Fordham L. Rev. 297, 312 (1961)).  The existence of a fiduciary duty requires a fact intensive inquiry. *See Café La France, Inc. v. Schneider Sec., Inc.*, 281 F. Supp. 2d 361, 372 (D.R.I. 2003)(holding that no fiduciary relationship existed because the defendant's representations to the plaintiff were clearly corporate puffery).  For the fiduciary duty to arise, the parties must have acted "as partners in a business venture for mutual profit or loss." *See A. Teixeira*, 699 A.2d at 1387.

To begin the analysis, this Court notes the Agreement does not refer to a partnership between Toray and National Plastics.  It merely references a "business relationship."  (ECF No. 1, Exhibit A.)  In addition, the use of the word "partner" or "partnership" colloquially in emails by executives of either company does little to establish that a legal partnership existed. National Plastics did not file partnership taxes with Toray, own property jointly, operate under a shared name, or share in mutual losses.  National Plastics asserts that it shared profits with Toray when National Plastics received 12% of sales of agreed materials.  However, National Plastics does not fairly characterize the nature of these sales; it receives 12% of the sale price, not 12% of Toray's profits.  Thus, National Plastics' commission is more accurately described as payment for reselling the agreed materials and as consideration for entering into the Agreement rather than as shared profits.

Independent of a legal partnership, the Agreement does not create a fiduciary duty between parties. National Plastics and Toray did not share profits and losses. Further, National Plastics' reference to *A. Teixeira* misses the point. While that case denies the existence of a rigid definition of a fiduciary relationship, it specifically involved the relationship between a corporation and its shareholders. In such a case, the party alleging the fiduciary relationship held specific titles as shareholders that established a baseline for the courts. Here, neither the company nor the companies' executives held shares in the other. The only title that fairly applies to Toray and National Plastics' relationship is that of seller and reseller.

Finally, National Plastics correctly points out that determining existence of a fiduciary relationship and legal partnership is a fact intensive inquiry. However, this is year four of the litigation and both parties have submitted substantial evidence to support their positions. Despite the large amount of evidence submitted, National Plastics has not shown that a genuine issue of material fact exists with respect to this issue, and thus Toray is entitled to judgment on this count as a matter of law.

This Court grants Toray's Motion for Summary Judgment on Count II of National Plastics' complaint because, as a matter of law, the parties were not partners and did not share a fiduciary relationship.

**D.    National Plastics' tortious interference claims - Counts III & IV**

Toray has moved for summary judgment on National Plastics' two tortious interference claims:  tortious interference with a third party and tortious interference with a prospective business advantage. National Plastics does not oppose entry of summary judgment on these two counts, therefore, this Court grants Toray's Motion for Summary Judgment on National Plastics' Counts III and IV.

E.   **National Plastics' negligent misrepresentation claim - Count VI**

Under Rhode Island law, negligent misrepresentation can sound in tort or contract law. To make out a viable claim for the tort of negligent misrepresentation, National Plastics must show that Toray misrepresented a material fact, Toray knew of the misrepresentation or nevertheless ought to have known, Toray intended National Plastics to act because of the misrepresentation, and National Plastics has suffered injury because of justifiably relying on Toray's misrepresentation. *See Manchester v. Pereira*, 926 A.2d 1005, 1012 (R.I. 2007)(citing *Mallette v. Children's Friend and Service*, 661 A.2d 67, 69 (R.I. 1995)).   Negligent misrepresentation can sound in tort even when a contract exists between the parties. *See Gupta v. Customerlinx Corp.*, 385 F. Supp. 2d 157, 162 (D.R.I. 2005)(holding that employer had negligently misrepresented the state of its business and employee was able to recover despite the existence of a contract between the parties).   However, the injured party can usually recover only expectation damages. *See id.*

1.   **The disclaimer and integration clauses do not specifically address the statements National Plastics relied on and therefore do not preclude National Plastics' negligent misrepresentation claim.**

The disclaimer and integration clauses within the settlement agreement do not specifically address the facts National Plastics relied on and do not preclude National Plastics' negligent misrepresentation claim. A disclaimer or integration clause can successfully preclude a negligent misrepresentation claim. *See LaFazia v. Howe*, 575 A.2d 182 (R.I. 1990).   The disclaimer and integration clauses, however, must specifically disclaim the facts upon which the injured party erroneously relied. *See id* at 183 (holding that the purchase agreement between the parties specifically disclaimed the restaurant's volume of business, which precluded the purchaser's suit).   Nevertheless, parties cannot use general, all-encompassing disclaimers to

preclude negligent misrepresentation claims.  *Compare Travers v. Spidell*, 682 A.2d 471, 473 (R.I. 1996), *with LaFazia*, 575 A.2d 182.

Toray contends that the Agreement's disclaimer prevents National Plastics' negligent misrepresentation claim.  The disclaimer states, "[t]he Parties assume the risk that the facts or law may be other than they believe."  (ECF No. 1, Exhibit A.)  This disclaimer resembles boilerplate language that could appear in any type of contract and does not reach the specificity required by *LaFazia* let alone *Travers*.  Toray also relies on the Agreement's integration clause but encounters the same problem.  The Agreement states, "it is an integrated document containing all of the terms and conditions agreed upon by the Parties relating to its subject matter . . . [and it] supersedes any and all prior or contemporaneous agreements, negotiations, correspondence, understandings and communications between the parties, whether written or oral."  (ECF No. 1, Exhibit A.)

The integration clause, like the disclaimer, does not specifically address the issue at the heart of National Plastics' negligent misrepresentation claim:  which Toray products the Agreement actually covers.  Therefore, this Court holds that the disclaimer and integration clause lack the specificity necessary to preclude a negligent misrepresentation claim.

## 2.    The economic loss doctrine does not preclude negligent misrepresentation claims.

Next, Toray argues that the economic loss doctrine prevents National Plastics' claim because National Plastics cannot recover pure economic loss from a negligence claim.  Both parties acknowledge this and discuss other decisions within the First Circuit.  Specifically, both parties cite to a Massachusetts case that analyzed the issue of recovering in tort on negligent misrepresentation.  *See MacDonald v. Old Republic Nat'l Title Ins. Co.*, 882 F. Supp. 2d 236, 246 (D. Mass. 2012)(predicting New Hampshire law).  Although Toray correctly points out that

an independent tort claim cannot arise based on a duty created through contract, this case law does not control in Rhode Island. The Rhode Island Supreme Court has never addressed the question of whether the common law economic loss doctrine applies to negligent misrepresentation.[5] "Though a claim for negligent misrepresentation is similar to a claim for negligence, the causes of action are discrete." *Forcier v. Cardello*, 173 B.R. 973, 987 (D.R.I. 1994). More specifically, negligent misrepresentation is a type of the tort of deceit not of mere negligence. *See id.* Furthermore, the District Court of Rhode Island has previously held that negligent misrepresentation required the plaintiff to show "financial loss or other harm." *Gupta*, 385 F. Supp. 2d at 187. Requiring a showing of financial loss but not also physical harm makes little sense if the economic loss doctrine prohibited the plaintiff from recovering purely economic losses.

Thus, this Court finds that the economic loss doctrine does not preclude National Plastics from recovering purely financial losses under its negligent misrepresentation claim. Because Toray has otherwise failed to show that there is no genuine issue of material fact, this Court denies summary judgment on Count VI.

### F.   National Plastics' request for attorneys' fees - Count VII

Toray argues that there is no genuine issue of material fact with respect to National Plastics' request for attorneys' fees and Toray is entitled to judgment as a matter of law. This Court may award National Plastics attorneys' fees only if it "finds a complete absence of a justiciable issue of either law or fact raised by the losing party; or renders default judgment for [National Plastics]." R.I. Gen. Laws § 9-1-45 (2012). The existence of a justiciable issue

---

[5] While the Rhode Island Supreme Court has not addressed this question, the United States District Court for the District of Rhode Island has. *See Gail Frances, Inc. v. Alaska Diesel Elec., Inc.*, 62 F. Supp. 2d 511 (D.R.I. 1999). Nevertheless, much of the underlying Rhode Island common law that the court relied on appears to have changed since the court issued its opinion.

between the parties prevents the award of attorneys' fees. *See Ross-Simons*, 66 F. Supp. 2d at 331 (holding that although defendant lost, it had an arguable defense and thus a justiciable issue existed). Given that this suit focuses on the interpretation of an ambiguous contract and requires fact finders to resolve the ambiguities, this case most clearly involves multiple justiciable issues.

Therefore, an award of attorneys' fees is inappropriate and this Court grants summary judgment dismissing National Plastics' Count VII.

### G.   Toray's request for specific performance - Counterclaim VII

In its final Counterclaim against National Plastics, Toray seeks specific performance of the Agreement. If a dispute over a settlement agreement arises after the original case has been dismissed, then "the aggrieved party may bring an independent action for breach of contract." *Malave v. Carney Hosp.*, 170 F.3d 217, 220 (1st Cir.1999). As discussed *supra*, contract law governs settlement agreements. *See Fairway Capital*, 453 F. Supp. 2d at 244. Under Rhode Island law, "a grant of specific performance is appropriate when adequate compensation cannot be achieved through money damages." *Yates v. Hill*, 761 A.2d 677, 679 (R.I. 2000). In such situations, money damages fail as adequate compensation because the performance of the contract involves a distinct or unique item, such as land. *See Griffin v. Zapata*, 570 A.2d 659, 661-62 (R.I. 1990).

Toray did not provide any evidence in support of its claim for specific performance as to why money damages would not provide adequate compensation if it was victorious in any of its counterclaims against National Plastics. Instead, Toray focused on how the award of money damages did not necessarily negate the award of specific performance. Though true, such an argument is irrelevant given Toray's failure to show that money damages would not adequately compensate for National Plastics' alleged breach.

Therefore, this Court grants summary judgment to National Plastics dismissing Toray's request for specific performance (Counterclaim VII).

## IV.    CONCLUSION

In sum, this Court GRANTS IN PART Toray's motion for summary judgment (ECF No. 174) and dismisses National Plastics' Counts II, III, IV and VII, and DENIES IN PART summary judgment as to Counts I, V and VI.  This Court GRANTS IN PART National Plastics' motion for summary judgment (ECF No. 178) and dismisses Toray's Counterclaims IV, V, and VII, and DENIES IN PART summary judgment as to Counterclaims I, II, III, and VI.

The Counts and Counterclaims that remain to be decided by a fact-finder are National Plastics' claims in Counts I (breach of contract), V (breach of duty of good faith and fair dealing), and VI (negligent misrepresentation), and Toray's Counterclaims in Counts I, II, III, (all breach of contract), and VI (breach of duty of good faith and fair dealing).

IT IS SO ORDERED:

John J. McConnell, Jr.
United States District Judge

August 2, 2013

23